IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**BRANDI M. MORALES,**                          )
                                                )
                                **Plaintiff,**   )
                                                )
**vs.**                                         )          **Case No.** 13-cv-1056-SMY-CJP
                                                )
**CAROLYN W. COLVIN,**                          )
**Acting Commissioner of Social Security,**     )
                                                )
                                **Defendant.**   )
                                                )

## MEMORANDUM and ORDER

**Yandle, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Brandi M. Morales is before the

Court, represented by counsel, seeking review of the final decision of the Commissioner

of Social Security denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for DIB on May 17, 2010. She alleged disability beginning on

December 28, 2006. (Tr. 11). After holding a hearing, Administrative Law Judge (ALJ)

James E. Craig denied the applications in a decision dated May 8, 2012. (Tr. 11-26). The

Appeals Council denied review and the decision of the ALJ became the final agency

decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint

was filed in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in his determination of plaintiff's residual functional capacity (RFC).

2. The ALJ erred in his failure to obtain testimony from a vocational expert and his usage of the medical-vocational guidelines.

3. The ALJ erred in his assessment of plaintiff's credibility.

4. The ALJ failed to properly consider plaintiff's mental impairments, in particular in the realm of social functioning.

<u>**Applicable Legal Standards**</u>

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or

mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step

evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to understand that the scope of judicial review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**<u>The Decision of the ALJ</u>**

4

ALJ Craig followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of spinal disorder, obesity, personality disorder, depression and anxiety. The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform the full range of work at the sedentary level with no limitations. Based on the Medical-Vocational Guidelines, the ALJ found that plaintiff was able to perform jobs which exist in significant numbers in the national and local economy. (Tr. 11-26).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1. Agency Forms

Plaintiff was born in December, 1976 and was 35 years old when ALJ Craig issued his decision. (Tr. 101). Plaintiff obtained a GED and had specialized training in phlebotomy and as a nursing unit clerk. (Tr. 106). She was 5′8″ tall and weighed 305 pounds. (Tr. 105).

According to plaintiff she had a number of health problems that made her unable to work including major depression and isolation with paranoia at times, anxiety, a spinal injury with severe pain and "electricity," and arthritis. (Tr. 105). Plaintiff previously worked as a registrar and a clerical support clerk in a hospital, a file clerk, a

nursing unit clerk, and a phlebotomist. (Tr. 106). She took several medications and as of December, 2011, she was taking Synthroid for hypothyroidism, Wellbutrin for depression, Lopressor for high blood pressure, Lasix for edema, Xanax for anxiety and panic attacks, Norco for pain, Robaxin for muscle spasms, and Neurontin for nerve pain. (Tr. 222).

Plaintiff submitted two Function Reports in 2010. (Tr. 124-34, 171-79). She stated she had a spinal injury that caused pain, numbness, burning, and electricity throughout her body. Additionally, she stated she had major depression, severe anxiety, panic, and isolation. (Tr. 124, 171). Her mom helped her with her two children. (Tr. 125, 172). She prepared quick and simple meals. The only household chores she performed regularly were vacuuming and doing laundry. (Tr. 126, 173). She was able to drive a car and shop for groceries. (Tr. 127, 174).

Plaintiff stated that her anxiety, depression, and panic attacks kept her from leaving the house frequently. (Tr. 171). She reported having difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking to others, climbing stairs, completing tasks, concentrating, following instructions, and using her hands. (Tr. 129, 176). She stated her Wellbutrin, Hydrocodone, Robaxin, and Neurontin caused side effects like nausea and drowsiness. (Tr. 178).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 12, 2012. (Tr. 34). She lived with her twelve year old son and six year old daughter. (Tr. 36). Her children went to her mother's home every day so that her mother could help care

for them. (Tr. 45-46). She received child support for her daughter, food stamps, a medical card, and Section 8 housing assistance. (Tr. 36-37).

Plaintiff fell and injured her back in December, 2006. (Tr. 37). She had surgery on her cervical spine in October, 2007. She stated she gained about one hundred pounds since her injury. (Tr. 37). The left side of her body, from her neck down through her legs, was frequently numb and had what she referred to as "electricity" shoot down her back and legs. (Tr. 38). She testified the medications she took made her drowsy and caused her to have difficulty concentrating. (Tr. 41).

Plaintiff saw a counselor at Egyptian Health Department regularly. She was recommended to see a psychiatrist but she did not want to leave her counselor. (Tr. 40). She stated she had depression that caused her to isolate from others for several days at a time. (Tr. 42). Plaintiff had anxiety attacks that caused her to tremble and feel like she could not breathe. She experienced an anxiety attack at the hearing as the ALJ noted her hands were rapidly trembling. (Tr. 44). Her counselor was teaching her ways to cope with her anxiety. (Tr. 45).

A vocational expert did not testify.

**3. Medical Treatment**

Plaintiff fell and injured her back and left shoulder in December 2006. (Tr. 564-67, 576). In January 2007, she went to the emergency room three times, had an MRI and an x-ray performed, and was admitted to a hospital for treatment of a herniated disc. (Tr. 433-34, 441-44. 448-51, 564-67). While plaintiff's x-ray was essentially negative, her MRI revealed multilevel degenerative cervical spondylosis, prominent broad-based disc

bulge at C3-4, mild diffuse bulging discs with minimal effacement of the thecal sac at C4-5 and C5-6, and mild central disc bulge with superimposed posterior annular fissure at C6-7. (Tr. 441-44). Plaintiff was admitted for her herniated disc and she was treated with three days of bed rest, I.V. fluids, steroids, and morphine before being discharged. (Tr. 448-451, 790).

Plaintiff then underwent physical therapy until April 2007 when her neck pain had improved somewhat. (Tr. 786, 783). Her doctor suggested conservative treatment and noted he did not believe she had radiculopathy. If conservative treatment did not help, he suggested C3-4 anterior decompression and fusion surgery and told plaintiff it was unlikely all of her symptoms would be alleviated. (Tr. 784).

In September 2007, plaintiff's primary care physician, Dr. Knight, had plaintiff undergo another MRI as her back and neck pain had not improved. (Tr. 730-32). The MRI showed mild annular disc bulges at C3-4 and C4-5 along with central disc herniation at C3-4 and right lateral disc herniation at C4-5 both producing mild spinal cord compression. (Tr. 776). After reviewing the MRI results a neurosurgeon recommended anterior cervical discectomy and fusion surgery, which she underwent in October 2007. (Tr. 523-25, 507).

In January 2008, plaintiff had improvement in her back and neck pain after surgery and was released from the neurosurgeon's care. (Tr. 520). In April 2008, however, plaintiff had worsening low back pain and complained of paresthesia. (Tr. 519, 723-25). She went to the emergency room three times complaining of chronic low back pain that radiated through her legs. (Tr. 570-75). A CT scan showed degenerative

changes and plaintiff was referred to pain management specialist Dr. Yogesh Malla. (Tr. 582-83).

Dr. Malla's initial functional assessment concluded plaintiff could sit for thirty minutes and stand less than thirty minutes at a time. Range of motion in her spine was reduced in all directions. His impressions were that she had cervical, lumbar, and thoracic disc displacement, cervical, lumbar, and thoracic degeneration of intervertebral disc, cervical post laminectomy syndrome, and cervical, lumbar, and thoracic facet joint atrophy. (Tr. 653, 679-80).

Dr. Malla saw plaintiff three to four times a year from 2008 through 2011. (Tr. 650-85, 953-57, 1036-43). He administered several spinal epidural injections to help manage her pain. (Tr. 670-673, 678). Additionally, he frequently prescribed and increased her pain medications and he recommended she should pursue conservative treatment. (Tr. 653, 657, 662, 666, 956).

Plaintiff attended physical therapy again in September and October 2008. While progress was being made, she canceled six out of seven of her scheduled appointments. (Tr. 575-80).

In May 2009, MRIs of plaintiff's back showed degenerative disc disease and joint disease in plaintiff's lower back, two disc herniations in her mid-back, and mild degenerative changes in her neck. (Tr. 603-04, 934-36). In February 2010, Dr. Knight noted that the course of plaintiff's back pain was improving gradually. (Tr. 812). In July 2010, she returned to Dr. Knight complaining of worsening shoulder pain and he had

an X-ray performed. The X-ray was negative for any findings and plaintiff was placed on additional pain medications. (Tr. 804).

In September 2010, plaintiff had two additional MRIs performed on her back which revealed degenerative changes, posterior diffuse disc bulging, central disc herniation, foraminal and spinal stenosis, and degenerative changes. (Tr. 397-40). Plaintiff had electromyography (EMG) performed in February 2011, which displayed no evidence of peripheral neuropathy or lumbo-sacral radiculopathy in the nerves or muscles in her lower limbs. (Tr. 1054). In May 2011, plaintiff saw Dr. Jones of Trinity Neuroscience Institute. He stated that surgery would be unhelpful for her pain and she should pursue physical therapy and pain management. (Tr. 1045).

Plaintiff also suffered from anemia, edema, hypertension, and hypothyroid syndrome. The record shows plaintiff received some treatment and prescriptions from her treating physicians for these problems. However, these issues were not as prominent in plaintiff's treatment history and medications seemed to help remedy the issues they presented. (Tr. 593-8, 678, 694-5, 699, 710, 738-43, 968).

### 4. Mental Health Treatment

Plaintiff first complained of ongoing depression to Dr. Knight in October 2007. He prescribed Zoloft and Wellbutrin to alleviate symptoms. (Tr. 727). He noted plaintiff's continuing depression, anxiety, with occasional mood changes, and insomnia repeatedly in his treatment records. (Tr. 688, 707, 710, 713, 716, 721, 727, 809). He continued to prescribe and adjust plaintiff's depression and anxiety medicine while plaintiff was in his care. (Tr. 697, 688, 707, 715-16, 727).

In March 2009, plaintiff began receiving mental health treatment from Egyptian Health Department. She sought treatment for depression, anxiety, and alcohol abuse. (Tr. 608). She was diagnosed with major depressive disorder, generalized anxiety disorder, alcohol abuse, and personality disorder with borderline traits. (Tr. 631). She had a GAF score of 60. (Tr. 632). Initially, Dr. Knight noted that plaintiff's depression and anxiety were worsening even while in counseling. (Tr. 716).

Plaintiff continued to receive counseling but she repeatedly described her increasing anxiety and depression as persistent. (Tr. 688, 716, 995-1026). Plaintiff had two mental status examinations performed by Egyptian Health Department. It was noted that she was obese and that she felt inferior, but also that she was alert, coherent, and had average intelligence. Plaintiff was depressed and anxious but her affect was appropriate. (Tr. 620, 1014). Her assessments noted that plaintiff felt counseling was helping but she still was in need of mental health services. (Tr. 628, 1021).

Plaintiff was frequently prescribed up to seven medications by her doctors for physical and mental conditions. Her prescriptions included Norco, Xanax, Lortab, Robaxin, Synthyroid, and Zoloft. (E.g., Tr. 661-62, 678, 684, 710, 718, 1030). These medications reportedly caused side effects of drowsiness, nausea, and vomiting. (Tr. 676, 1030).

### 5. Dr. Chandra's Opinion

The non-treating psychiatrist for Egyptian Health Department, Dr. Rakesh Chandra, reviewed plaintiff's records in January 2012. He opined that plaintiff had mental limitations that are not compatible with competitive employment, with extreme

limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace. He stated that plaintiff had physical limitations that would limit her to less than sedentary part-time work. (Tr. 1028-34).

### 6. Consultative Examinations

Plaintiff was evaluated by a consulting physician, Dr. Raymond Leung, in July 2008. He noted that plaintiff was morbidly obese, was able to walk unassisted for fifty feet, had five out of five strength in her arms and hands, and four-plus out of five strength in her legs. He opined that plaintiff's gait was slightly stiff and she walked with a minimal limp. Additionally, she had tenderness in her low back and had a decreased range of motion in her neck, hips, and knees. (Tr. 544-47).

Plaintiff's first consultative mental examination was performed by Dr. Harry Deppe, Ph.D. He diagnosed plaintiff with alcohol dependence, an adjustment disorder with depressed mood, and a personality disorder not otherwise specified. He also observed that plaintiff's mood was within normal limits, she was able to stay on task, she could relate with others, and understand and follow instructions. He felt she had the ability to withstand the stresses of day to day work was fair to good. He assessed her GAF score at 50-60. (Tr. 552-55).

In July 2010, Dr. David Warshauer, Ph.D., performed plaintiff's second consultative mental examination. (Tr. 864-67). He determined plaintiff was oriented for person, place, time, and situation. He thought she was somewhat anxious and somewhat depressed but her intelligence was in the normal range or possible higher.

He diagnosed her with alcohol dependence, panic disorder with agoraphobia, and borderline personality disorder. He determined her GAF score to be 43. (Tr. 866).

### 7. RFC Assessments

Two state agency consultants performed RFC assessments based on a review of plaintiff's records.

State agency physician, Dr. Henry Rohs, assessed plaintiff's physical RFC in September 2010. (Tr. 920-26). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined that plaintiff could stand, walk, or sit for six hours out of an eight hour workday. She was limited to occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, as well as occasional stooping, kneeling, crouching, and crawling due to degenerative disc disease. (Tr. 920-21). He also limited plaintiff's reaching in all directions with no other manipulative limitations. (Tr. 922). This opinion was seconded by Dr. Pardo of Disability Determination Services (DDS) in January 2011. (Tr. 985-87).

Plaintiff's mental RFC was also assessed in September 2010 by Dr. Joseph Mehr, Ph.D. (TR. 927-29). He found plaintiff to be moderately limited in the ability to understand and remember detailed instructions and carry out detailed instructions. (Tr. 927). He stated plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and concentration, persistence and pace. (Tr. 915). He opined that plaintiff's overindulgence in alcohol caused many of her problems and that when she is not intoxicated she has the capacity to perform most tasks. (Tr. 929). These opinions were seconded by Dr. DiFonso of DDS in February of 2011. (Tr. 985-87).

## Analysis

Plaintiff argues that the ALJ incorrectly determined her RFC, erred in not having a vocational expert testify, erred in his credibility determination, and improperly assessed plaintiff's mental impairments. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

Plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003). However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. See, *Pepper v. Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012).

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported

14

by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski* 245 F.3d 887.

Additionally, SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3

Although the ALJ considered a variety of factors in his analysis, his credibility determination cannot be upheld. First, the ALJ considered plaintiff's activities of daily living and determined they were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 17).

The Seventh Circuit has repeatedly held it is appropriate to consider these activities but it should be done with caution. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Plaintiff's daily activities can all be done with significant limitations and do not indicate she can complete an entire workday or workweek. The ALJ noted that she had two children, could shop, prepare simple meals, pay bills, and drive a car. While in another portion of his opinion the ALJ acknowledged that plaintiff needed

help from her parents in raising her children, and that she could only do a little housework at a time, he seemingly did not take that into account when determining her daily activities were inconsistent with disabling pain.

The ALJ failed to explain how plaintiff's daily activities related to her capacity to perform work. It is unclear how plaintiff's ability to drive a car or take care of her own personal needs translates into the ability to adequately perform work for an entire workweek. The ALJ's reliance upon her daily activities without further explanation is inadequate.

The ALJ noted that plaintiff stated she could get along with authority figures and pay attention. He also stated that while she said her back pain was getting worse, treatment notes seemed to be improving in 2010, and she had no symptoms in December 2011. The Court agrees with plaintiff that the ALJ seemed to pick and choose portions of the record to include in his credibility analysis, omitting sections that were not in harmony with his opinion. The Seventh Circuit recently, and repeatedly, has held that a credibility determination is erroneous when an ALJ selectively analyzes the record. *Scrogham v. Colvin*, 765 F.3d 685, 698-99 (7th Cir. 2014), *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

For example, plaintiff did state that she could pay attention and follow written instructions fairly well. However, she also stated that starting or completing tasks often depended on her level of pain or her depression. (Tr. 129). The ALJ referenced an improving treatment note from Dr. Knight in February 2010 and an office visit regarding contraception in 2011. However, plaintiff presented to Dr. Malla multiple

times in 2010 and 2011 with continuing complaints of pain for which she received treatment. (Tr. 953-57, 1036-43). She returned to Dr. Knight in July 2010 and multiple times in 2011 with increasing pain after the portion of the record that the ALJ cites. (Tr. 803).

While elsewhere in his opinion the ALJ mentioned these visits, he seems to put more weight on the one doctor's notation that her pain seemed to be improving than the evidence as a whole. Moreover, while the treatment note for contraception states that she had no current symptoms, it was in reference to her current birth control, and not problems with her back, neck, legs, depression, or anxiety. The ALJ took this note out of context.

This Court notes that an ALJ's credibility analysis is not confined to one paragraph and may be woven throughout his opinion. *Sawyer v. Colvin*, 512 F. App'x 603, 608 (7th Cir. 2013) Here, when the entire opinion is analyzed it appears as though the ALJ selectively disregarded portions of the record in order to form his credibility determination, which is error. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

The ALJ noted that plaintiff's failure to attend several physical therapy sessions factored into his finding a lack of credibility. While a failure to seek treatment may work against a plaintiff's credibility, the Seventh Circuit has stated that if an ALJ relies on a claimant's failure to seek treatment, he must question the claimant as to the reasons. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). "The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical

17

treatment." S.S.R. 96-7p. The ALJ here failed to do so. He looked at the records stating plaintiff missed several physical therapy sessions and decided to hold it against her.

Finally, he addressed plaintiff's medications. While he acknowledged that she did experience side effects he stated that he considered those side effects in forming her RFC. He did not explain how he considered them, nor is it clear from the rest of his opinion. It is not enough just to describe claimant's testimony with respect to each factor; the ALJ must also analyze how the testimony factored into the credibility analysis. See *Villano*, 556 F.3d 562. The Seventh Circuit has held the ALJ must build a logical bridge to his conclusions in these instances which he failed to do in forming plaintiff's credibility determination. See *Hamilton v. Colvin*. 525 Fed. Appx. 433, 438 (7th Cir. 2013)(establishing an ALJ must do more than merely mention activities a claimant undertakes to establish the ability to work).

The Court then looks to the ALJ's RFC analysis. Plaintiff makes several arguments with regards to the ALJ's failure to appropriately determine her RFC because of physical and mental nonexertional limitations.  An RFC is "the most you can still do despite your limitations."  20 C.F.R. §1545(a).  In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record."  *Ibid*.  Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

The ALJ limited plaintiff to a full range of sedentary work. Plaintiff argues that this RFC is not inclusive enough in that it fails to take into consideration the limitations found by state agency reviewing physicians of only occasional climbing ramps, stairs,

ladders, ropes, or scaffolds, kneeling, crouching or crawling, as well as the need to avoid concentrated exposure to hazards such as machinery or heights. Plaintiff's argument on this point is unavailing.

The Commissioner correctly notes SSR 85-15, where it was stated that stooping, kneeling, crouching, and crawling on an occasional basis leaves the sedentary occupational base virtually intact. Along those lines, SSR 83-14 states that the inability to ascend or descend scaffolding, poles, and ropes has little to no effect on unskilled work, which is more inclusive than sedentary work.  The adjudicator is supposed to consider the extent of any erosion of the occupational base and access its significance. SSR 83-12. Here, the erosion of the occupational base for these issues is minimal and while plaintiff believes the ALJ erred in not addressing these limitations, the ALJ's analysis here was appropriate.

Plaintiff also argues that her obesity and side effects of her medications were not properly factored into the RFC determination. While obesity is no longer considered a listing, an ALJ is required to consider obesity in evaluating other impairments. Plaintiff argues that the ALJ failed to appropriately evaluate her obesity by not finding more restrictions for her RFC. Her argument here is ineffective.

The ALJ acknowledged plaintiff's obesity several times in his opinion. (Tr. 13-14, 20-21). He included it as a severe impairment and went on to state he felt it limited her ability to work. While he did not provide great detail as to how plaintiff's obesity specifically impacted her ability to work, he did indirectly take it into account in his discussion of state agency physicians' opinions. Plaintiff argues that because the ALJ

rejected portions of these physicians' opinions that he therefore did not take her obesity into account appropriately. However, the ALJ limited plaintiff's RFC more than the state agency physicians, as he restricted plaintiff to sedentary work while the physicians limited her to light work. ALJ Craig gave their opinions some weight, but he decided that plaintiff had greater limitations than they provided. The Seventh Circuit has held it is error for an ALJ not to consider obesity unless the ALJ adopts limitations from a claimant's physicians. *Arnett v. Astrue*, 676 F.3d 586, *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, it is clear that ALJ Craig adopted those limitations and more.

Furthermore, plaintiff failed to explain how her obesity actually limits her functioning and exacerbates her impairments, and she did not point to any evidence suggesting as much. She merely recited from SSR 02–1p which indicates that obesity "commonly leads to, and often complicates, chronic diseases of the . . . muscoluskeletal system" (Doc. 23, p. 14). Because plaintiff failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless.

Plaintiff then argues that the ALJ failed to take certain mental limitations into consideration in the formation of her RFC. First, plaintiff contends that the ALJ erred in not including additional limitations with regard to concentration, persistence and pace. This Court agrees.

The ALJ acknowledged that plaintiff had impairments that created moderate difficulties with concentration, persistence and pace that related to her medications, anxiety, and depression.  Yet, the ALJ fails to add any limitations regarding this finding

into his RFC. Plaintiff criticizes the usage of this language and cites a series of Seventh Circuit cases in support, most notably, *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010).

In *O'Connor-Spinner*, the ALJ found the claimant had a moderate limitation in concentration, persistence and pace but did not include that limitation in his RFC. *Ibid.*, 617-18. The commissioner in that case argued the ALJ implicitly incorporated the limitations into his RFC by confining the plaintiff to "routine, repetitive tasks with simple instructions." *Ibid.*, 618. The Appeals Court found this terminology did not supply the vocational expert with adequate information to determine if the plaintiff could perform jobs in the national economy. In *O'Connor-Spinner*, the appeals court clearly stated "[i]n most cases. . . employing terms like 'simple, repetitive tasks' on their own will not exclude . . . positions that present significant problems in concentration, persistence and pace." *Ibid.*, 620. Additionally, the court went on to state "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus. . . on these limitations and assure reviewing courts [that there is] substantial evidence of the jobs a claimant can do." *Ibid.*, 620-21.

Here, the ALJ failed to include any additional limitations. The ALJ agreed that concentration, persistence and pace impairments existed for plaintiff at least to a moderate degree but failed to include them in his limitations or analysis of work capabilities. He stated that plaintiff's medications cause her to be sleepy and reduce her ability to concentrate and maintain persistence or pace. He noted that plaintiff does not do well with spoken instructions or handle stress of changes in routine well. (Tr. 15).

However, the ALJ did not limit plaintiff in any way. No limitations to unskilled work, repetitive tasks, or simple spoken instructions exist in his opinion.

In *O'Connor-Spinner* the restrictions of simple and repetitive tasks were not enough, and even those were not included here. The Commissioner cites SSR 85-15 in support of the determination that plaintiff can perform a full range of sedentary work because she can pay attention and follow written and spoken instructions. SSR 85-15 states that a claimant can perform the basic mental demands of unskilled work if the claimant is able to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."

However, as noted above, the ALJ noted plaintiff had difficulty with spoken instructions and changes in routine work setting. (Tr. 15). Furthermore, the portion of SSR 85-15 that the Commissioner cites references unskilled work to which the ALJ did not limit plaintiff. As a result, the ALJ's current RFC cannot stand as it must take plaintiff's problems with concentrations, persistence and pace into consideration more explicitly.

Plaintiff then contends that her mental impairments as a whole were not fully taken into account. She argues that the ALJ erred in not giving more weight to the opinion of state reviewers who assessed moderate limitations in all three of the functional activities of daily living, social functioning, and maintaining concentration,

persistence and pace. (Tr. 915, 987).

First, it is important to note that an ALJ is not required to accept the opinion of a state agency consultant, especially as to RFC, which is an issue reserved to the Commissioner.  20 C.F.R. §404.1527(e) & (f).

The ALJ looked at Dr. Mehr and Dr. DiFonso's opinions and gave the portion regarding daily activities and social functioning little weight. He felt that plaintiff's ability to care for her children, maintain personal care, make meals, perform chores, drive, and shop in stores was more in line with a mild limitation of daily activities. (Tr. 23).

Contrary to plaintiff's belief, the ALJ here did not "play doctor" with regard to her activities of daily living. It is true that the ALJ's decision must be based on testimony and medical evidence in the record, and not on his own "independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).  The ALJ here did not form his own "independent medical findings," but rather looked to the way plaintiff's doctors interpreted the evidence and plaintiff's own testimony to form his opinion on her daily activities. *Ibid.*, *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2011).

However, the ALJ's analysis with regard to social functioning is flawed. The ALJ considered a mental health assessment from plaintiff's consulting psychologist who found that plaintiff gets along with authority figures and could relate to others. He also stated plaintiff self-reported that she had no problems with authority figures and seemingly used these portions alone to determine plaintiff had a mild restriction in social functioning. (Tr. 22).

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.

20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00(C)(2). The ALJ recited portions of the record showing that plaintiff had panic attacks, isolated herself, no longer associated with friends, and had persistent and increasing anxiety. (Tr. 17, 21-24). Plaintiff had symptoms of an anxiety attack in front of the ALJ at the hearing, which he noted on the record and in his opinion. (Tr. 17, 44). However, it does not appear that he took these instances into consideration when determining plaintiff had only a mild impairment with regard to social functioning.  Simply stating that these problems exist but not factoring them into his opinion is inadequate. The ALJ must build a logical bridge to his conclusions which requires more than a mere recitation of the record. See, *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir.2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir.2004), *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

This Court next looks at plaintiff's argument that the ALJ erred in not consulting a vocational expert. The ALJ looked to the Medical-Vocational Guidelines (the "grids") in his determination that plaintiff was not disabled and that she could perform a full range of sedentary work. The ALJ found plaintiff to have no nonexertional limitations with regard to her RFC and therefore did not consult a Vocational Expert.

The regulations provide that usage of the grids is appropriate when the claimant

has no nonexertional limitations. 20 C.F.R. Part 404, Subpart P, Appendix 2, §200.00(e). See also, *Haynes v. Barnhart*, 416 F.3d 621, 628-629 (7th Cir. 2005). However, the Seventh Circuit has held that that "where a nonexertional limitation might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert." *Zurawski* 245 F.3d 889.

The ALJ found plaintiff had severe spinal disorder, obesity, personality disorder, depression and anxiety. (Tr. 13). The ALJ noted plaintiff's anxiety at times caused her to have difficulty interacting with others. (Tr. 17). At one portion of the record the ALJ referred to one doctor's opinion that plaintiff could work as long as she was restricted to simple, repetitive tasks. (Tr. 21). As discussed above, the ALJ acknowledged plaintiff's moderate difficulties with concentration, persistence and pace.

However, similarly to *Zurawski*, because this Court has ordered a redetermination of plaintiff's RFC, "it would be premature to direct the ALJ to solicit vocational testimony from an expert. That said, however, the ALJ must act consistent with the law in this circuit. . . if [he] relies on the grids on remand." *Zurawski*, 245 F.3d at 890. If the ALJ chooses to incorporate any nonexertional limitations he must consult a vocational expert in his redetermination of plaintiff's ability to find work.

Because of the ALJ's errors in evaluating plaintiff's credibility and RFC determination in this case, it must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the

contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

<u>Conclusion</u>

The Commissioner's final decision denying Brandi M. Morales's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.
**IT IS SO ORDERED.**

DATE:  November 25, 2014.                    <u>**/s/Staci M. Yandle**</u>
                                             **STACI M. YANDLE**
                                             **DISTRICT JUDGE**